The third case for this morning is SEC v. Reven Holdings, 24-1235. Counsel for Appellant, if you'd make your appearance and proceed, please. Thank you, Your Honor. May it please the Court, I'm John Schreiber of Winston & Strawn. On behalf of the appellants, Reven Holdings, Reven Pharmaceuticals, and their officers, Peter Lang, Brian Dennemy, and Michael Volk, who are all here today. With the Court's permission, I'd like to reserve three minutes for rebuttal, if I may. This case is an unfortunate example, not only of the SEC overreaching, but of allowing itself to be weaponized and used as an instrument by a small group of Reven's own investors and one of its former employees. This group sought to create their own competing business, in connection with which they sought to appropriate Reven's intellectual property for itself. As remarkable as that may sound, the undisputed evidence on these points, which the District Court wholly ignored, is summarized with record citations at pages 13 to 15 of our opening brief. As detailed there, in furtherance of these hostile efforts, in mid-October of 2022, this group reached out to the SEC in the hope of tying up Reven and its principals in protracted litigation. It worked. Within weeks of this group reaching out to the SEC, the SEC filed an ex parte application for a TRO, seeking, among other things, to enjoin Reven's principals from offering or selling securities, a mandatory injunction, and to freeze all of the company's assets, as well as the individual assets of the Reven principals. This was a broad asset freeze. We're not talking about blocking the transfer of a particular parcel of property or enjoining the company from selling particular assets. This was an asset freeze that applied to all assets, funds, or other property of any kind, including, without limitation, intellectual property, including patents and trademarks. It also applied to any and all bank, brokerage, and other financial accounts, both of the company and of the individuals. In other words, the asset freeze was intended to, and unfortunately did, shut down the company's operations entirely, as well as the lives of the individual defendants here. Counsel, can we get to some of the district court findings about misstatements? I'm going to ask you about the second group, which were the audits, the required audits before going public. Your opening brief says repeatedly that the district court essentially ignored evidence about having the prerequisite audits. But I wanted to ask about three different slide presentations that were sent to investors in November and December 2021, and the district court quotes from these slides to say that the company, quote, has the minimum required two years of audited financial statements. But I don't see you really contest that finding in your briefs. Do you agree those were false statements? Two things on that, Your Honor. No, we don't, or at least in context, I think there was testimony that the district court received, although not live, since he didn't hold a hearing. But there was testimony that put that in context, that the slides were intended to reflect what would be the case. Well, but the slides say, Revin, quote, has the minimum required two years of audited financial statements. Did they have those two years of audited financial statements? They did not, Your Honor. So then you agree it's a false statement? I would agree that that literally taken was not true. I think most of what we had put forward here against Sienter is a major component here. It's a component both of two showings, really, that the SEC had to make here. They had to make a clear showing of a violation of the securities laws, which would include showing clearly false and misleading statements with Sienter. Now, for Section 17, negligence would be enough. For Section 10, it's not. You need more, at least recklessness, which is— But you are challenging the district court's findings in this regard and asking us to overturn those findings. But there were clear false statements made. So isn't that a pretty heavy lift for us to now say, well, the district court clearly abused its discretion in making these findings when there were just false statements being made by the company to the investors? Your Honor, I appreciate the question. That's only one element of one component of what the SEC had to show here. So to show a violation of the securities laws, it's a clear showing they had to make, and they have to show a materially false or misleading statement. So even if we acknowledge that is materially false and misleading, we didn't. We challenged mainly materiality on that in looking at the total context of information available to investors. But even accepting that that is a materially false and misleading statement, the SEC also had to make a clear showing of scienter, even just for prong one, to show a violation of the securities laws. And because the SEC sought a mandatory injunction, it had to show not only the clear violation, but that that violation was likely to recur. And there, the scienter requirement has more teeth. Negligence is not enough. I don't follow you on that, counsel. I'm sorry. Okay. They didn't have anything that they said they did. They were overpaid by about $5 million. They didn't have any financial statements. What is it that the court should have done in the face of that? Your Honor, with all due respect, the individual defendants were not overpaid. I'm sorry, the what? They were not overpaid. The unchallenged forensic accounting evidence. Well, forget the forensic evidence. What did they actually do and what had they told the people that were going to invest? Here's what we're going to pay. And, in fact, they took $5 million more than that. Now, whether they were entitled to that had the thing gone on and been successful. But it didn't happen that way. And they've got, oh, yeah, we've got two audited financial statements. They didn't even have an auditor. They hadn't even had an auditor. So where do we go with that? Well, two separate components to that, Your Honor. The SEC's original theory here was that the individual defendants had built investors and essentially stolen $8.8 million of investors' money for their own benefit. That was conclusively rebutted through forensic accounting evidence. And the SEC did not oppose that forensic accounting evidence. But why does that matter? We're worried about what the district court's findings were. And as Judge Kelly pointed out, the district court found that what they received is different than what they told investors they received. Now, whether they could have gotten, you know, were entitled to more, sure. But you also say in your brief, well, the investors could have, you know, they could have uncovered this information themselves about what they're entitled to receive. But it doesn't change. You can't say, well, the investors, they could have uncovered the lie. But it's still a lie, isn't it? That's what we're struggling with is the district court's findings. I appreciate that, Your Honor. And let me put it this way, especially given the limited amount of time I have. We are challenging the district court's findings and asserting that there is an abuse of discretion in four respects. What we focused on here so far is really just the first one, is whether the SEC made a clear showing of a violation of the securities laws. Even if it did, you don't get to an injunction and you surely don't get to this level of an asset freeze. So even if there was a materially false or misleading statement or three, whatever it was, that is step one. Step two, because this is a mandatory injunction, the SEC had to go further and had to show, make a clear showing that the defendants were likely, these violations were likely to recur. That is a scienter analysis that goes beyond the first showing. They had to show something akin to intent. Negligence is not enough. Recklessness could be enough, but the recklessness standard. Let me just take their word that, well, we did all these things wrong, but we're not going to do it again. Is that your position? That is the testimony. Again, we didn't have a hearing here. That's one of the issues I'll get to. But there was testimony through declarations and depositions that the district court did have the benefit of, that explained in context where these statements came from. I would submit that at most they're innocent mistakes or negligence. But that does not get you to a clear showing that they're likely to recur. Again, that's a heightened showing of scienter. But even if the SEC could make both of those showings, you still have the asset freeze. And there the district court belatedly acknowledged that it would have to address the balance of hardships as well as the public interest. Well, before getting to the asset freeze and focusing on the injunction itself, sort of implicit in your two-step process is what the statutory standard was. But didn't the Supreme Court tell us after Starbucks that for the preliminary injunction we were supposed to be looking at the winter test, right? Yes. Okay, well, the winter test has more than two parts to it. Yeah, it's both. What do you mean both? Winter is the test that we need to look at for the injunction, right? It's what the SEC had to show, and I think at least as it stated, the standard district court got it right. It had to make a clear showing of a securities violation as well as the likelihood that it would recur because it was mandatory. You also have to show the traditional four elements, which would include balance of hardships and the public interest. And what authority do you have for the belt and suspenders? Starbucks says that, no, you don't apply what the statutory standard was. You apply the winter test. Now, they may overlap, granted, on the likelihood of success on the merits. But where do you get the notion that we're now in a belt and suspenders world? That is not the reading, certainly not the reading the district court had, and it's not our reading of Starbucks that it didn't undo the clear showing analysis for the SEC. What Starbucks says is that those four traditional elements still must be shown. These traditional elements that were in the winter's test?  And I thought in the footnote of the district court, it said if it needed to do this, it would do that. In other words, in the alternative, it would do the winter's test, right? That is what the footnote in the later opinion said. You're correct about that, Your Honor. And so it is your position that if one infers from that footnote, that one had to do both? That is our position, yes. Okay. And beyond what the district court said, do you have any authority that says that? It's our reading of Starbucks is that it didn't upset that clear showing requirement, particularly for a mandatory injunction, which we have here. But if I may, the areas where we have challenged the district court, again, I mentioned there were four. So the first, is there a clear showing of a violation of securities laws? Two, is there a clear showing it's likely to recur? Third, even if the SEC made that clear showing and an injunction of some kind is appropriate, it was an abuse of discretion to include this asset freeze as part of it. I'd like to address that, particularly as it relates to the balance of hardships and the public interest. Here, the court needed to look at the purpose of the injunction, which the district court said was to prevent future violations of the securities laws. But here, the injunction already prohibited the Revin principles from further offering or selling securities. So that piece is good enough. If, as the district court said, the purpose of the injunction is to prevent future violations, you're covered on the first component of the injunction. And the court seemed incredibly receptive to hearing ways that it should modify what was initially a very broad, admittedly, stay. And you kept giving reasons how to modify it, and the court did modify it. I mean, so I guess what I'm getting at here is under an abuse of discretion standard, if you end up in a world where you're saying, well, you know, you could have done more, you could have done these other things, don't you automatically lose? No, Your Honor, and here's why. The court had to conclude that it was appropriate to issue this injunction, looking at the purpose of the injunction to begin with, which is supposed to prohibit future violations. I would submit you're already covered with other aspects of the injunction. Two, the typical purpose of an asset freeze is to preserve assets. Here, I mentioned the insurgent group. They agreed with us that the asset freeze, and this was all in the record by the time the district court agreed to continue it. What the insurgent investors said is that, to get my direct quotes, is that rather than preserving Revin's assets, the asset freeze is causing them to dissipate due to ongoing harm to their ability to protect their intellectual property, finalize clinical data, and eventually secure approval for their products. The asset freeze and injunction, by their own terms, prevent any operations by Revin, including those operations that would otherwise be necessary to preserve value. Well, counsel, this is a good argument before the district court. I think Chief Judge Holmes' question is, the district court has shown it's open to modification. It was too late. I didn't mean to cut you off. The harm had, there was no basis to enter the- But the asset freeze order has been modified. It has.  But there was no, it's an abuse of discretion to have entered the asset freeze to begin with. There was no basis for- So from the outset- From the outset, that was an abuse of discretion, and there was a long runway here before the court, there were seven months after the close of briefing before the court decided. The preliminary injunction motion, plenty of time for a hearing, but the court decided not to hold one. Let's address that in the remaining time. So why did the district court abuse its discretion in not holding a hearing that you didn't ask for? We did ask for a hearing. Where? I didn't see that anywhere on the record. The court, in its initial temporary restraining order, provided for a hearing that was going to include cross-examination, directs, opening statements, and closing statements. My reading of the record was that you then asked the court, or told the court, that wasn't necessary. The argument that the SEC has made there reflects a lack of understanding of district court proceedings. This came in as an ex parte application and an order, and that order, before our clients ever saw it, before we ever got hired, had a response to the preliminary injunction motion for us due in nine days and a hearing a few weeks to follow. That was not going to work, given the allegations of accounting fraud and improprieties. We needed to get expert accounting evidence to put in a proper response. And so you asked the court to put it off, to not do it, right? We needed more time to put in our brief, our written opposition. That is what would trigger a new hearing, yes. And when did you explicitly, using the word hearing, ask the court, now we're ready, Your Honor, hold a hearing? Your Honor, the stipulation that went in that put off our original response date, which was necessary, also put off the hearing date, necessarily. But the stipulation expressly contemplated that there would be a hearing. Obviously, that needs to be set by the court. We couldn't dictate to the court. Whoa, whoa, whoa. You are the proponent here. You're here claiming the court erred by not doing something. Where in the record did you ask it to do it? After this withdrawal, after saying we're not ready, Your Honor, this would be too quick, where thereafter did you ask the court explicitly, I want a hearing? Your Honor, the court sua sponte in the interim issued an order that said, okay, here's the new briefing schedule. And once I get defendant's brief, I will decide, don't ask me, I will decide whether I want a hearing, whether I want an evidentiary hearing, or whether I'll decide on the briefs. So the court put that out there. We did follow up when it took seven months for a decision. We did follow up to ask where the court was and which of these. But you didn't ask for a hearing. When I asked the question, you said, well, we did ask for one. But I haven't heard where anywhere in the record yet where you asked the district court to actually hold the hearing. It may have been contemplated. The district court may have said, well, I'll get back to you after I receive briefing. You sent an email to find out where the court was. But where did you say, have a hearing? Your Honor, at that point when it was originally supposed to be a hearing and you're just putting off the scheduling of the briefing with the presumption that a hearing would follow and the court would tell us when it was, that was the world. To talk about what world we live in, that's where we were. The court then on its own issued an order saying, I will let you know, don't ask me. If I want a hearing, I'll tell you. Otherwise, I'll decide it on the briefs. I've had other courts that do not appreciate that when they have told parties at the district court level, I'll let you know if I want a hearing. Neither side should request it. We typically don't. Over my time. Thank you. Good morning, Your Honors. And may it please the court, Paul Alvarez for the Securities and Exchange Commission. Your Honors, the district court's orders entering a preliminary injunction and asset freeze and the later order modifying that asset freeze should be affirmed because it was a reasonable exercise of its discretion in fashioning such equitable relief. Two threshold questions for you. Is the asset freeze, should we view that as a component of the preliminary injunction itself or as a standalone separate issue? I think it's, you know, there's a suite of powers that the court has and I think they have two distinct purposes. And to your, you know, point about winter, I think winter as Starbucks makes clear in the Third Circuit in the Chappelle case makes clear, that applies equally, that standard applies equally both to injunctions and to asset freezes. But the purposes are slightly different. The purpose of the injunction is to protect from future harm by preventing misconduct in the future. And the purpose of the asset freeze, as the district court found, is to facilitate the enforcement of any remedy if liability is determined by preventing the dissipation or the depletion of what remains of the assets. And do you agree with the principle that post winter, we have a belt and suspenders situation where we have to do both the statutory standard and winters? Not at all, Your Honor. The Supreme Court made clear that in Starbucks that the winter standard governs the four factor test set forth and winter governs this type of injunctive relief and that absent a clear command, quote unquote, from Congress on that issue, there is no additional element that needs to be decided and there is no clear command from Congress on that. And I have not heard my friend, either in the briefing or here today, identify one. I know Starbucks is somewhat hot off the press, but has any circuit court applied Starbucks to the SEC statutory authorizations? Because Starbucks is about the NLRB and I understand how you can take the reasoning from it. But are you aware of any authority that a circuit court has looked at Starbucks in the context of SEC enforcement? The Chappelle case in the Third Circuit, which we've cited in our brief, does so. And so that would be the one I would point to. You mentioned a lot of things, Your Honors. There were a lot in your colloquy back and forth with my friend. I think it's important to remind the court of where we are and how we got here. You know, there is this assumption in a lot of my friend's arguments that the district court, it was too little too late even from the outset at the issuance of the TRO that that was effectively the death knell of the company and that there was some sort of intent to ruin the company and the lives of the defendants. And that's not at all true. As your question alluded to, Chief Judge Holmes, the record is replete with examples of the district court taking into account the interests of the business, the interests of the defendants. The TRO itself permits a carve-out upon a proper showing by the parties for a carve-out from the TRO. I also would like to point out that once the TRO was entered into, as you mentioned, the defendants at the parties filed a joint motion to vacate the hearing. But in that joint motion, and this was at the defendant's request, understandably because they needed to get up to speed, they agreed to extend the TRO until the preliminary injunction motion was resolved. They then subsequently sought four additional extensions, which, again, we're not faulting them for, but that sort of plays into the amount of time that is being considered. And then you look to the decisions themselves, which are thorough, and there's 16 appendices in this appeal alone on the issue of preliminary injunctive relief. The court considered all of that evidence. And at every turn, the court permitted the defendants, and indeed asked them, please give me something specific that I can do that will help you maintain the value of the assets, allow you to continue the business moving forward. But for approximately a year, the defendants maintained simply, nope, we don't want any of that, you either we don't want any restrictions on our ability to do anything at all, no asset freeze should issue because we didn't violate the federal securities laws. But as you pointed out, Judge Kelly, in your questions, the evidence shows, clearly shows that the defendants made, and you too, Judge Federica, I don't want to leave you out, but the evidence clearly shows that they made misstatements of material fact to investors about three material topics, the actual compensation that the Revin principles received, Revin's readiness for an audit, and the fact that they actually had audited financials, two years of audited financials that are required to go public, and then the third, the existence of the shareholder lawsuit against two of the Revin principles and Revin itself for securities fraud. Now those are all, as we cited too in our brief, as we mentioned in our brief, the evidence shows those facts are just demonstrably untrue and provably false. They knew, as far as Sienta, my friend mentioned Sienta, this is an issue of Sienta, he says, but they knew what was true, and yet they said something completely the opposite of that. And as the district court found at, I want to get this right, the district court I believe it is at one order 22, which is page 22 of the first order. We're in a full disclosure regime here in the securities industry, and it is unreasonable for investors to presume that when the defendants say something, for example, I received $5 million in compensation, but they actually received $10 million in compensation, or, for example, when they say we have audited financials, when in fact they don't have audited financials and they really mean that they're going to try and get them at some point. Those things are demonstrably different than the things that they're actually saying. The truth is completely different from what they've actually said, and what matters is what they say, not what they know secretly. And so, you know, all of this is to say that the district court thought about the interests of the defendants, thought about it at every turn, and gave them opportunities to come and seek a carve-out, and we know that the court took those things seriously because on I think six or seven occasions the court granted carve-outs, often either the same day or the day after the carve-out was requested, to allow the defendants to maintain their business, to pay for intellectual property assets to be maintained. So the court really took into account both the defendants' interests and the interests of the investors who were harmed to ensure that the judgment of the value of what remained the assets could be maintained to satisfy a judgment. But as to the public interest factor, let's say, of Winter, I don't see any contesting and perhaps you don't, but contest the notion that bringing RJX to market would have at least conceivably been good for the public, right? I don't think that's, I don't necessarily know whether that would be good for the public or not. I'm not, you know, a biopharmaceutical expert. I don't think that they were as close as they're perhaps claiming to be. If they're at phase two of clinical trial, that's completely different than phase three. So the idea, as the district court found, getting through phase two would require tens of millions of dollars of money, and even success at that point is not guaranteed. And the court has to take into account the possible likelihood of this, of the success of that effort. And the court also has to take into account- Well, this goes to the death knell issue. I mean, if it is conceivable that, in fact, they're producing a product that could have benefit to the public and they need to get through the clinical trials, if an asset freeze has the impact of creating a death knell for them, then that weighs against the public interest, does it not? That's the point I'm making. It could. It could. But I think we also have to remember, Your Honor, that at the time the asset freeze, the original TRO was entered into, they had approximately $200,000 in the bank. So this is not, so it's simply, as the court found, it's not realistic. Given that condition, as the court found, I think it's at the second order, page 18, resuming the clinical trials and normal business operations, while that may have been their preference, it simply wasn't realistic given the undisputed fact that they were in dire financial straits. So really what we have here, Your Honors, in assessing the public interest, I think it's important to keep this in mind, is that the defendants wanted to be able to do a lot of things, but they were financially incapable of doing it. The evidence clearly showed that they had, for a period of years, engaged in multiple acts in different areas of securities fraud and obtained millions of dollars in doing so. And so they simply didn't have the ability to do what they wanted to do. And then they became intractable and said, we don't want to offer you anything, even though the court asked, please give me a specific plan. Help me help you. They, for approximately a year, refused to do so. And in assessing the public interest, you have to take that into account as well. Unless the court has any further questions, we would ask – Can I ask actually one more? I'm going back to the Starbucks and the four factors, traditional factors for preliminary injunction. I know you said that the district court acknowledged, you said, you know, those don't apply, but even if they did, I would apply them in this manner. Why wouldn't it be prudent for us to remand back to the district court and say, hey, Starbucks has now come out. As a matter of law, the test you applied has changed. So we want you to go back and do this in the first instance. Because I think if you look at the original order and the revised order, and before I answer this question, I'd like to point out, you know, we brought Starbucks to the district court's attention. The defendants certainly didn't. And so we are, you know, we're asking the court to really take another look at this and consider it. And the court went out of its way to do so. But I think if you look at the first two orders, I think it's clear that the analysis under Starbucks would come out exactly the same way. And really the way Starbucks is formulated is really asking the district court to consider a lot of different factors. And so the Supreme Court has said, well, yeah, there's this two-element test, but we'd like you to show your work a little bit more, district court. And I think the district court's thorough order certainly does that here. I don't think there's any question about the likelihood of success element, nor is there one about the irreparable harm. And, again, the evidence both in the orders themselves and just procedurally, the granting of the carve-outs and things like that, shows that the court was considering at every step the balance of the equities to ensure that there was money left to satisfy a judgment while ensuring that the defendants could, to the best of their abilities, with whatever limited resources they had left, maintain their business. Let me understand one thing in terms of these efforts the court did to do carve-outs. Just sort of procedurally, as I understand it, on appeal here is the preliminary injunction itself and the order that the court entered saying we're not going to relieve you entirely of the stay, but I'll go along with these specific things. Those two things. Well, within the interim period, there were a lot of activities by the district court, at least as I understand it, you know, this notion of, well, give me this carve-out, give me this carve-out, most of which the court did. I think all of it. All of it. Yes, absolutely. But promptly, what role should that stuff play in what we're doing now? Well, I think you have to look at, I think you have to, it certainly can play a role. You can look at that and see whether or not there is, I think it's additional evidence that the court was taking into account the interest in balancing the equities here, right, and trying to make sure that it gave good attentiveness to the defendant's interests. But, I mean, but they were subsequent to the actual orders that are on appeal, which is, I mean, to the order. Well, to one of them. To one. Right, yes, yes. To the preliminary injunction order. Right. So, I mean, that has to be dealt with on, well, maybe it doesn't have to be dealt with on its face. I'm just asking. That's what I'm asking. Yeah, I mean, it's tricky, right, because they have, procedurally, we're sort of in an odd spot. We have this order that imposed the injunction in asset freeze. Then we have this subsequent procedural carve-outs and things like that, right, and then we have this order modifying. Yes, and I can, at risk of trying to put words in your mouth, let me throw out something and have you respond to it.  At least one argument I could think of would be, the question becomes whether the initial order actually contemplated or allowed for, did not preclude this interstitial stuff, and, you know, in terms of the carve-outs, and if that's true, then in viewing the order itself, we can be informed by the carve-outs. Yes, I think that's exactly right, and I think if you look at the TRO, even the TRO envisioned carve-outs. The court said in the original TRO, and I want to make sure I get that exactly right, the TRO at 10 Appendix 1467, even at the TRO phase, the court granted numerous carve-outs and baked in carve-outs to the original TRO, and I think the defendants were proceeding on that before the preliminary injunction was issued when they were seeking carve-outs as well. So, yes, I think you can, as you said, Chief Judge Holmes, there is room in the original order for such carve-outs, and that the court then subsequently permitted those carve-outs, and that's additional evidence that you can consider in assessing its, whether the analysis was an abuse of discretion, and we would maintain that that was well within the court's discretion to do so. I see my time is up. Unless the court has further questions, we would ask that the court affirm. Thank you very much, Your Honor. Verifying arguments. Case is submitted. As I noted, we will take a recess.